UNITED STATES DISTRICT COURT
                            FOR THE
                   WESTERN DISTRICT OF NEW YORK

MICHAEL MINGO,                )
                              )
          Plaintiff,          )
                              )
     v.                       )      Case No. 1:17-cv-556
                              )
NIAGARA FRONTIER              )
TRANSPORTATION AUTHORITY,     )
                              )
          Defendant.          )

## OPINION AND ORDER

Plaintiff Michael Mingo claims that Defendant Niagara Frontier Transportation Authority ("NFTA") fired him from his job because of his race. NFTA contends that it fired Mingo for stealing company property. NFTA now moves for summary judgment, arguing that Mingo has failed to establish that the stated reason for his firing was a pretext for discrimination. For the reasons set forth below, the motion for summary judgment is **granted**.

## Factual Background

Michael Mingo is African American. He was first employed by NFTA as a Locksmith in or around March 2002. Shortly after beginning his employment at NFTA, his job title was changed to Maintenance Tech II. That position was part of a bargaining unit represented by the International Longshoremen's Association Local 2028 (the "Union").

In December 2007, Mingo was upgraded from Maintenance Tech II to Maintenance Locksmith Technician, and in October 2010 he was promoted to Senior Maintenance Technician. In September 2011

and again in September 2012, Mingo received good performance evaluations. Those evaluations rendered him eligible for step increases pursuant to the operative collective bargaining agreement.

After 2010, Mingo's immediate supervisor was Christopher Brophy. Mingo testified in his deposition that Brophy would sometimes mock the speech of certain ethnic groups, including African Americans and Hispanics. ECF No. 12-8 at 18. He also testified that Brophy began treating him differently after Mingo reported to upper management that Brophy had referred to NFTA Executive Director Kim Minkel and her Administrative Assistant as "bitches." *Id.* at 21. Such differential treatment by Brophy included giving Mingo an increased workload, telling him that he was "a nobody," and threatening him with a possible transfer to the Rail Department. *Id.*

The events that resulted in Mingo's firing took place in early October, 2015. At that time, the restrooms at NFTA's 181 Ellicott Street bus terminal in Buffalo, New York were being torn down and rebuilt. Mingo was asked by Brophy and co-employee Jerry Galazka to help complete the demolition work. *Id.* at 30. Mingo has testified that he heard Brophy and Galazka mention removing steel panels from the site to "buy pizza and wings for everyone." *Id.* at 26.

On October 4, 2015 (a Sunday), Mingo arrived at 181 Ellicott

2

Street and noticed that most of the demolition work had been completed. He subsequently told Galazka he would clean the restroom area and go home. *Id.* at 34-35. Galazka reportedly took Mingo outside the bus terminal and showed him multiple steel panels. *Id.* at 27. Mingo claims that he and Galazka discussed removal of the steel panels, ultimately deciding to rent a U-Haul truck, load and transport the panels, and sell them for scrap. *Id.* at 28. Mingo allegedly tried to call Brophy on his cell phone to ask about using an NFTA credit card to rent the U-Haul truck, but was unable to reach him. *Id.* at 42-43. Brophy's cell phone has no record of Mingo trying to call him on October 4, 2015.

When Mingo returned with the U-Haul truck, Galazka was no longer at the site and Mingo was unable to reach him on his phone. As Mingo was loading the panels, Brophy arrived at 181 Ellicott Street and spoke with him. Brophy did not stop Mingo from loading the truck. According to Mingo's testimony, he informed Brophy that he was removing the panels, and Brophy assigned him another task to perform when he was finished. *Id.* at 52. After seeing Mingo loading the panels, Brophy called his immediate supervisor, Facilities and Property Manager Richard Russo. Russo, in turn, called NFTA's Police Department and Executive Director Minkel to report Mingo's activities.

NFTA police waited across the street from where Mingo was

3

loading the panels, then followed him to Niagara Metals in Cheektowaga, New York. As Mingo was in the process of selling the panels, NFTA police took him and the U-Haul truck into custody. When questioned, Mingo told the police that Galazka had permission from Brophy to take and sell the panels. The police also questioned Galazka, who did not corroborate Mingo's story.

According to NFTA, Brophy sold the panels and delivered the $317.00 in proceeds to the NFTA Accounting Department. NFTA also submits that it was in the practice of selling scrap metal for the benefit of the company. Mingo denies any knowledge of NFTA's scrap policy, but asserts that other employees were allowed to sell scrap metal for their own benefit or for the benefit of co-employees.

On October 5, 2014, Executive Director Minkel was advised of the full scope of Mingo's actions. Specifically, she was told that Mingo had rented a truck and tried to sell valuable scrap metal from an NFTA bus terminal; that he told NFTA police he was selling the metal with permission from Brophy; that Galazka was unable to corroborate Mingo's story; and that Brophy denied granting any such permission. Minkel was also told that, according to Galazka, Brophy had said that "everything connected with the old restroom was to be considered trash." ECF No. 12-9, ¶ 7 (Minkel Aff.). Minkel attests in an affidavit that NFTA has a longstanding policy of recycling scrap metal for the purpose of

4

generating revenue, and that she "found it hard to believe that an employee with [Mingo's] long seniority was ignorant of that fact that [NFTA] endeavored to sell scrap metal for the Authority's benefit whenever possible." *Id.*, ¶ 9.

As NFTA had a policy against dishonest behavior, Minkel authorized Mingo's immediate termination. Minkel asserts in her affidavit that Mingo's race played no role in her decision-making, and that she made her decision solely on that fact of Mingo's rental of a U-Haul for the purpose of removing and selling NFTA property without authorization. *Id.*, ¶ 18. In the course reaching her decision, Minkel did not speak with Brophy. ECF No. 12-21, ¶ 10 (Brophy Aff.).

NFTA has offered evidence of Caucasian employees who were terminated because of dishonesty. One was fired for being in possession of stolen property. Another was terminated for adding extra overtime hours to his timesheets. A third was also terminated for falsifying timesheets. NFTA further asserts that Minkel was unaware of NFTA employees selling scrap metal without delivering the proceeds to the Accounting Department. Mingo has named three Caucasian employees who he believes previously took scrap metal to a recycling center. ECF No. 12-8 at 62.

After his termination by NFTA, Mingo went to trial in Buffalo City Court and was acquitted of being in possession of stolen property. In 2016, the Union filed a grievance on his

5

behalf.  After three hearings, Arbitrator Michael Lewandowski ruled that NFTA did not have just cause to terminate Mingo's employment and ordered him reinstated with back pay.  The arbitrator found, in relevant part, that just cause was lacking because NFTA had failed to show Mingo committed larceny.  ECF No. 16-4 at 51-52, 54.  Mingo is currently employed at NFTA as a Senior Maintenance Technician.

Prior to filing this civil action, Mingo submitted a charge of discrimination to the Equal Employment Opportunity Commission (EEOC).  The EEOC determined that there was "reasonable cause to believe that [NFTA] has discriminated against [Mingo] on account of his race/black."  ECF No. 16-3 at 3.  Specifically, the EEOC concluded that Brophy had misled NFTA "decision makers into terminating [Mingo] without a complete picture of the facts," and had "a history of complaints based upon discriminatory animus."  *Id.*

Mingo filed this action on June 19, 2017.  His Complaint sets forth two causes of action: (1) unlawful discrimination based on race and (2) hostile work environment discrimination, both brought pursuant to Title VII of the Civil Rights Act of 1964.

## Discussion

I. **Summary Judgment Standard**

NFTA has moved for summary judgment on Mingo's claim,

arguing that the undisputed facts do not support a claim of race discrimination. To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In determining whether the movant has met its burden, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In determining whether there are genuine issues of material fact, the Court is again "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is

sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). That said, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

**II. Unlawful Discrimination**

A plaintiff alleging Title VII discrimination is subject to the three-part burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McPherson v.*

8

*New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006). Under that test, a plaintiff first "bears the minimal burden of setting out a *prima facie* discrimination case." *Id.* If the plaintiff satisfies his burden, he "is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* Finally, if the defendant proffers a legitimate, nondiscriminatory reason, "the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *Id.* (internal quotation marks and citations omitted).

To establish a *prima facie* discrimination case, a plaintiff must show that: (1) "he belonged to a protected class," (2) "he was qualified for the position," (3) "he suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks and citations omitted). Mingo submits that he can satisfy each requirement in that he is African-American; was qualified for his position; suffered an adverse employment action; and was reported by a Caucasian male (Brophy) with a known history of discriminatory conduct.

NFTA does not contest Mingo's *prima facie* showing. NFTA instead focuses on its reasons for firing Mingo, and its related

9

contention that Mingo has failed to offer sufficient evidence of pretext. The facts underlying Mingo's termination are largely undisputed. Mingo rented a truck and removed steel panels in order to sell them for scrap. He has testified that Brophy authorized such removal in at least one discussion with Galazka. When apprehended, Mingo told NFTA police that he had permission from Brophy through Galazka. Galazka did not corroborate Mingo's statement. When Mingo's conduct was reported to Minkel, she enforced company policy and fired him for dishonesty.

Mingo contends that NFTA's argument is subject to collateral estoppel because an arbitrator previously found a lack of "just cause" for termination. Mingo also argues that NFTA is estopped from relying on the same facts asserted in the arbitration proceeding and in response to the charge before the EEOC. "Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002). Collateral estoppel applies when: "(1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006). "[T]he party asserting

10

preclusion bears the burden of showing *with clarity and certainty* what was determined by the prior judgment," and "[i]ssue preclusion will apply only if it is *quite clear* that this requirement has been met."  *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 49 (2d Cir. 2003) (quoting *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997) (internal quotation marks omitted) (emphases added in *Postlewaite*)).

With respect to any estoppel effect of the arbitrator's decision, the question of "just cause" is not before this Court. Nor is the question of whether there is sufficient evidence to show that Mingo committed larceny.  Instead, the issue is whether NFTA's stated reason for firing Mingo was, in fact, a pretext for discrimination on the basis of race.  That issue was not raised or decided in the arbitration proceeding.  Moreover, findings of a neutral arbitrator are generally "not preclusive of subsequent Title VII litigation."  *Temple v. City of New York*, No. 06-CV-2162 RRM CLP, 2010 WL 3824116, at *9 (E.D.N.Y. Sept. 23, 2010) (citing *Tennessee v. Elliott*, 478 U.S. 788, 796 (1986)); *see also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59-60 (1974) ("The federal court should consider the employee's claim *de novo*.  The arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate.").

With respect to the EEOC determination, "[n]o court has ever held . . . that EEOC proceedings are sufficiently judicial in

11

nature to warrant estoppel. In fact, the opposite is true, as every court that has considered the issue has found that EEOC determinations have no preclusive effect." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 369 (S.D.N.Y. 2006) (citations omitted); *see also McDonnell Douglas Corp.*, 411 U.S. at 798–99 (stating that "we will not engraft on the statute a requirement which may inhibit the review of claims of employment discrimination in the federal courts"). Accordingly, the Court finds no legal basis for applying collateral estoppel.

Estoppel aside, Mingo places significant reliance on the arbitrator's findings. Those findings include: Brophy reportedly told Galazka, who in turn told Mingo, that all debris was considered trash; Brophy did not inform Mingo of NFTA's disposal policy when he saw him loading the panels; Brophy made a gesture which Mingo understood to mean that his actions were acceptable; and Mingo tried to contact Brophy to obtain permission to use the company credit card. ECF No. 16 at 14. The arbitrator deemed these facts relevant to the question of Mingo's intent to commit larceny. The question here is whether they are also relevant to the question of pretext.

To establish pretext at summary judgment, "the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based

12

in whole or in part on discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (per curiam) (internal quotation marks omitted). The employee is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors" for the decision. *Holcomb*, 521 F.3d at 138 (citation omitted); see also 42 U.S.C. § 2000e-2(m) (race, color, or sex must be "a motivating factor" for employment decision). Here, the employer's stated reason for termination was dishonest behavior. NFTA has submitted undisputed evidence that Caucasian employees were terminated on that same ground.

The decision to terminate was made by Executive Director Minkel based upon facts relayed to her, in large part, by NFTA police. There is no evidence in this case that either Minkel or members of the NFTA police harbored any sort of discriminatory animus. Furthermore, with respect to NFTA management generally, there is no suggestion in the record that Mingo was ever treated unfairly or differently because of his race. Throughout his tenure at NFTA he received promotions and step increases, in part because of positive performance reviews from Brophy. Mingo testified that his limited personal interaction with Minkel was positive. ECF No. 12-8 at 56-57. Minkel has explained the reasoning for her decision, and Mingo has offered no evidence

13

upon which a reasonable jury would find that, instead of termination for dishonesty, Minkel was motivated by discrimination.

The linchpin of Mingo's discrimination claim appears to be Brophy. To the extent that there is any evidence in the record of race-based discrimination or animosity, it is Brophy's reported mockery of African-American and Hispanic speech. The record also shows, however, that Brophy gave Mingo favorable work reviews and that any prior mistreatment by Brophy was based not upon race discrimination, but instead upon Mingo's reporting to upper management about Brophy's insult toward Minkel and her assistant.

Although Brophy may have initiated management review of Mingo's actions, he played no further role in the disciplinary process and it was Minkel who made the final decision. *See, e.g., Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999) (affirming summary judgment where there was "no evidence" that the allegedly-biased person played "a meaningful role in the review process"). Minkel's decision relied largely upon NFTA police interviews. When the answers from those interviews were inconsistent, with Brophy and Galazka both contradicting essential parts of Mingo's story, Minkel had to determine the appropriate course of action. Minkel also based her decision on her understanding of NFTA's scrap disposal policy and her

14

surprise that Mingo was not aware of that policy.

The arbitrator may have been correct in concluding that, based upon the evidence presented to him, Mingo was not fired with sufficient cause. More specifically, the arbitrator may have properly concluded that NFTA was wrong when it determined that Mingo intended to steal company property and sell it for personal profit. The arbitrator's decision, however, does not give rise to a claim of unlawful race discrimination.

The burden of persuading the trier of fact as to intentional discrimination lies with the plaintiff. At the summary judgment stage, he must show that "the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000). Here, no reasonable juror could make such an inference. The decision to terminate was made by NFTA's Executive Director after collecting information that included police interviews. Those interviews suggested that Mingo's version of events was not credible. Again, there is no allegation that either the police or the Executive Director harbored any discriminatory animus. While Mingo has offered names of Caucasian employees who sold scrap metal without negative repercussions, there is no evidence that Minkel or

others in management were aware of those incidents.[1]
Accordingly, even when viewing the facts in a light most favorable to the non-moving party, Mingo's claim that race was a motivating factor in his firing fails as a matter of law.

**III. Hostile Work Environment**

Mingo's hostile work environment claim is premised solely upon his termination from NFTA. ECF No. 1, ¶ 44 (Complaint alleging that this "single incident" was sufficiently severe to alter the conditions of Mingo's work environment). Because Mingo's unlawful discrimination claim fails as a matter of law, his hostile work environment claim is similarly barred. *See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class.").

## Conclusion

For the reasons set forth above, NFTA's motion for summary judgment (ECF No. 12) is **granted.**

DATED at Burlington, Vermont, this 13th day of March, 2020.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge

---

[1] Each of those employees has signed a statement swearing that he never took surplus metals or supplies from NFTA premises to sell as scrap for personal profit. ECF Nos. 12-4, 12-5, 12-6.